AO 91 (Rev. 11/11) Criminal Complaint

LODGED
CLERK, U.S. DISTRICT COURT
5/10/2022
CENTRAL DISTRICT OF CALIFORNIA
BY: vam  DEPUTY

# UNITED STATES DISTRICT COURT
for the
Central District of California

| | |
|---|---|
| UNITED STATES OF AMERICA<br>v.<br>JOSEPH ANTHONY APODACA,<br>Defendant(s) | Case No. 2:22-mj-01849-DUTY |

FILED
CLERK, U.S. DISTRICT COURT
MAY 10 2022
CENTRAL DISTRICT OF CALIFORNIA
BY _____ DEPUTY

## CRIMINAL COMPLAINT BY TELEPHONE
## OR OTHER RELIABLE ELECTRONIC MEANS

I, the complainant in this case, state that the following is true to the best of my knowledge and belief. On or about the date of April 22, 2022, in the county of Los Angeles in the Central District of California, the defendant violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 922(g)(1) | Felon in Possession of Ammunition |

This criminal complaint is based on these facts:

*Please see attached affidavit.*

☒ Continued on the attached sheet.

_____
*Complainant's signature*

Jonathon Kemp, Special Agent
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date: May 10, 2022

_____
*Judge's signature*

City and state: Los Angeles, California

Hon. Jacqueline Chooljian, U.S. Magistrate Judge
*Printed name and title*

AUSA: Morgan J. Cohen (x2848)

**AFFIDAVIT**

I, Jonathon Kemp, being duly sworn, declare and state as follows:

### I. PURPOSE OF AFFIDAVIT

1. This affidavit is made in support of a criminal complaint and arrest warrant against JOSEPH ANTHONY APODACA ("APODACA"), also known as "Goofy", for a violation of 18 U.S.C. § 922(g)(1): Felon in Possession of Ammunition.

2. This affidavit is also made in support of an application for a warrant to search the following digital devices (collectively, the "SUBJECT DEVICES"), in the custody of the Long Beach Police Department ("LBPD") in Long Beach, California, as described more fully in Attachment A:

   a. One black Samsung cellular phone with a cracked screen bearing IMEI# 355069177643497 ("SUBJECT DEVICE 1");

   b. One white Apple iPhone bearing IMEI #356451106602126 ("SUBJECT DEVICE 2"); and

   c. One black Coolpad 3622A cellular phone bearing IMEI# 863519030115377 ("SUBJECT DEVICE 3").

3. The requested search warrant seeks authorization to seize evidence, fruits, or instrumentalities of violations of 18 U.S.C. § 922(g)(1) (felon in possession of ammunition) (the "Subject Offense"), as described more fully in Attachment B. Attachments A and B are incorporated herein by reference.

4. The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and

i

witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested complaint, arrest warrant, and search warrant, and does not purport to set forth all of my knowledge of or investigation into this matter. Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only and all dates and times are approximate.

## II. BACKGROUND OF AFFIANT

5. I am a Special Agent ("SA") with the United States Department of Justice, Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF"), and have been so employed since September 2020. I am currently assigned to the ATF Los Angeles Field Division, Long Beach Field Office. As an ATF SA, I am charged with investigating violations of federal alcohol, tobacco, firearms, explosives, and arson laws and regulations.

6. I am a graduate of the Federal Law Enforcement Training Center's Criminal Investigator Training Program. I have also completed specialized training at the ATF National Academy regarding alcohol, tobacco, firearms, explosives, and arson. Before joining ATF, I served in the United States Marine Corps as an Infantry Assaultman and routinely dealt, and became familiar, with firearms and explosives. Following my service, I earned a bachelor's degree in International Studies from Texas A&M University, and a master's degree in International Affairs from The Bush School of Government and Public Service at Texas A&M University.

### III. SUMMARY OF PROBABLE CAUSE

7. On April 22, 2022, LBPD officers attempted to pull over the silver Dodge Charger (the "Charger") APODACA was driving for failure to display a front license plate. APODACA refused to yield and led the officers in a vehicle pursuit. During the pursuit, the officers saw APODACA throw a handgun from the driver-side window. The gun was later determined to be a polymer 80 Glock-style .40 caliber pistol, loaded with one round of .40 caliber ammunition in the chamber and seven rounds of .40 caliber ammunition in a magazine. An ATF Firearms and Interstate Nexus Expert has determined that all eight rounds of ammunition traveled in interstate commerce. LBPD officers eventually lost track of the Charger.

8. Later on April 22, 2022, LBPD found the Charger in an alley off of East Anaheim Street. A witness showed the officers video he had recorded from his car's backup camera, which showed the Charger pull into the alley at a high rate of speed and come to an abrupt stop before the driver and passenger jumped out and ran away. The video also showed that the driver left the driver-side door open after he fled. LBPD officers searched the Charger and discovered SUBJECT DEVICE 1, SUBJECT DEVICE 2, and mail addressed to APODACA.

9. On April 30, 2022, LBPD officers found APODACA seated in a Chevrolet SUV in the parking lot of the Coast Motel on East Pacific Coast Highway. LBPD officers arrested APODACA for felony evasion, in violation of California Vehicle Code

2800.2.(A), and being a felon in possession of a firearm, in violation of California Penal Code 29800(a)(1).

10. APODACA's mother was present when LBPD officers arrested APODACA. She stated that the Chevrolet SUV in which APODACA was found belonged to her, and gave consent to search the vehicle. During a search of the vehicle, LBPD officers discovered SUBJECT DEVICE 3. APODACA's mother said that SUBJECT DEVICE 3 belonged to APODACA.

11. Following his arrest, in a Mirandized interview, APODACA admitted that the silver Dodge Charger belonged to him, and he threw his gun from the silver Dodge Charger during the vehicle pursuit on April 22, 2022, stating: "I thought I was smooth with it."

## IV. STATEMENT OF PROBABLE CAUSE

12. Based on my review of law enforcement reports, conversations with other law enforcement agents, and my own knowledge of the investigation, I am aware of the following:

### A. APODACA Throws Loaded Gun from Window While Fleeing Police

13. Based on my review of LBPD reports, I know the following:

　　a. On April 22, 2022, at 12:44 p.m., LBPD Officers Justin Davenport and Rick Zatarian saw a silver Dodge Charger bearing temporary California license plate number BM65K12 (the Charger) turn onto Juniper Avenue. The Charger had no front license plate, in violation of California Vehicle Code 5200(a). The LBPD officers saw that the Charger was being driven by a

Hispanic man, approximately 20 to 30 years old, with a tattoo on the side of his neck (later identified as APODACA), and that another man was riding in the passenger seat. The LBPD officers activated their patrol car's emergency lights and siren and attempted to initiate a traffic stop. The Charger failed to yield and kept driving. The LBPD officers deactivated their lights and siren and kept following the Charger. A few moments later, after the Charger made a turn, the LBPD officers saw the driver throw a black and tan colored handgun out of the driver-side window.

b.   Officer Zatarian exited the patrol car and ran to the location where the firearm had landed in order to secure the area. Officer Davenport continued driving the patrol car in pursuit of the Charger. As Officer Davenport caught up to the Charger, he initiated his patrol car's lights and siren. The Charger again did not yield. Officer Davenport pursued the Charger for nearly four minutes, during which time the Charger committed multiple violations of the California Vehicle Code, including driving into oncoming traffic in violation of California Vehicle Code 21659, before ending his pursuit out of concern for public safety.

B.   **Officers Recover the Firearm and Ammunition**

14.   Based on my review of LBPD reports, I know that as Officer Davenport pursued the Charger, Officer Zatarain collected the firearm and rendered it safe. He saw that the firearm was a black- and tan-colored polymer 80 Glock-style .40 caliber pistol (commonly known as a "ghost gun") loaded with one

round of .40 caliber ammunition in the chamber and seven rounds of .40 caliber ammunition in the magazine. The firearm and ammunition were placed in LBPD evidence.

### C. Officers Recover SUBJECT DEVICES 1 and 2 and Identify APODACA as the Driver of the Charger

15. Based on my review of LBPD reports, I know that shortly after the pursuit ended, on April 22, 2022, at approximately 12:58 p.m., LBPD received a report that a suspicious vehicle matching the description of the Charger had been abandoned in an alley off of East Anaheim Street. LBPD Officers Cory Thomson, Alan Feldman, and Pongkhamarack Chau responded to that location and found the Charger in the middle of the alley.

16. As they were examining the Charger, a witness ("Witness 1") approached the LBPD officers and stated that he had recorded video from his car's backup camera, which, in turn, captured the Charger's arrival and subsequent abandonment in the alley. Witness 1 showed Officer Thomson the video he recorded, which he also uploaded to YouTube.[1] The video showed the Charger pull into the alley at a high rate of speed before making an abrupt stop. Once the Charger came to a complete stop, the driver and passenger can be seen hurriedly exiting and running away from the Charger. After exiting the Charger, the driver left the driver-side door wide open.

---

[1] On April 22, 2022, Officer Thomson was able to view the video at the following link: https://youtu.be/.Pzzj0_rsVBI. However, as of the date of filing, the video is no longer available on YouTube.

vi

17. Officers Feldman and Chau searched the now-abandoned Charger and found SUBJECT DEVICE 1, SUBJECT DEVICE 2, and mail addressed to APODACA.

18. Based on the footage provided by Witness 1, the LBPD officers were able to identify APODACA -- whom they recognized from pervious encounters -- as the driver of the Charger.

### D. Officers Arrest APODACA and Recover SUBJECT DEVICE 3

19. Based on my review of LBPD reports, I know the following:

   a. On April 30, 2022, at approximately 3:10 p.m., LBPD Officers T. Preuss and T. Keefe were on regular patrol and saw APODACA seated in the front passenger seat of a Chevrolet SUV, bearing California license plate number 4CUS421 (the "Chevrolet SUV"), parked in the parking lot of the Coast Motel on East Pacific Coast Highway. The LBPD officers recognized APODACA from previous interactions with him, and knew that he was suspected of evading the police following a vehicle pursuit on April 22, 2022. The LBPD officers handcuffed and detained APODACA inside the Chevrolet SUV until Officers Davenport, Feldman, and Chau arrived on scene.

20. A woman who identified herself as APODACA's mother approached the officers and confirmed APODACA's identity. Officers removed APODACA from the Chevrolet SUV and arrested him for two offenses in connection with the above-described events of April 22, 2022: (1) being a felon in possession of a firearm, in violation of California Penal Code Section 29800(A); and (2)

evading the police, in violation of California Vehicle Code Section 2800.2(A).

    a. APODACA's mother told the LBPD officers that the Chevrolet SUV belonged to her, and consented to a search of the vehicle. Upon searching the vehicle, Officer Davenport located SUBJECT DEVICE 3. Officer Davenport asked APODACA's mother if SUBJECT DEVICE 3 belonged to APODACA, and she stated that it did.

### E. **APODACA Admits Throwing the Firearm From the Charger**

21. Based on my review of LBPD reports, I know the following:

    a. After officers arrested APODACA, Officer Feldman read APODACA his Miranda rights from LBPD Form 1000.008 and asked him if he understood his rights. APODACA replied, "yes," verbally signaling that he understood his rights.

    b. Officer Davenport asked APODACA where he obtained the firearm. APODACA stated that he got the firearm from a "plug" who wanted to help him get "back up on his feet."

    c. When Officer Davenport told APODACA that he saw him throw the gun from the Charger during the April 22, 2022, vehicle pursuit, APODACA put his head down, smirked, and said: "I thought I was smooth with it."

    d. APODACA asked Officer Davenport if the Charger's temporary license plate was what drew his attention. Officer Davenport told APODACA that the Charger's lack of a front license plate is what drew his attention. APODACA then asked

what would happen to the Charger, and stated that he had recently purchased the vehicle.

  e. APODACA further stated that he called his girlfriend during the April 22, 2022, vehicle pursuit and left her a voicemail in which he stated he was going to jail.

 22. During the booking process, Officer Davenport advised APODACA not to run from the police again. APODACA stated that his run from the Charger on April 22, 2022, had left him "tired."

  **F.** **APODACA Has At Least Five Prior Felony Convictions**

 23. On May 4, 2022, I reviewed APODACA's criminal history and conviction documents and learned that APODACA has previously been convicted of the following felony crimes punishable by a term of imprisonment exceeding one year:

  a. On July 8, 2013, a violation of California Health and Safety Code Section 11377(A), Possession of a Controlled Substance, in the Superior Court of California, in the County of Los Angeles, Case Number NA096134.

  b. On May 9, 2014, a violation of California Penal Code Section 459, Burglary in the First Degree, in the Superior Court of California, in the County of Los Angeles, Case Number NA098446.

  c. On January 14, 2016, violations of California Health and Safety Code Section 11370.1(A), Possession of a controlled substance while armed; California Penal Code Section 29800(A)(1), Felon in Possession of a Firearm; and California Penal Code Section 30305(A)(1), Felon in Possession of

Ammunition in the Superior Court of California, in the County of Los Angeles, Case Number NA102575.

d. On April 9, 2018, a violation of California Penal Code Section 4573(A), Controlled Substance in a Correctional Facility, in the Superior Court of California, in the County of Los Angeles, Case Number NA108759.

e. On September 13, 2021, a violation of California Vehicle Code Section 10851(A), Theft of Vehicle, in the Superior Court of California, in the County of Los Angeles, Case Number NA117163.

### G. The Ammunition Traveled in Interstate Commerce

24. On May 5, 2022, ATF SA David Gonzalez, an ATF Firearms and Interstate Nexus Expert, reviewed the eight rounds of ammunition recovered from the firearm APODACA threw from the Charger and determined the following:

a. Three rounds were Winchester .40 S&W caliber ammunition, marked with the headstamp "WINCHESTER 40 S&W," and were manufactured by the Olin Corporation in Illinois or Mississippi;

b. Four rounds were Federal Cartridge (FC) .40 S&W caliber ammunition, marked with the headstamp "FC 40 S&W," and were manufactured by FC in Minnesota; and

c. One round was FC .40 S&W caliber ammunition, marked with the headstamp "FEDERAL 40 S&W," and was manufactured by FC in Minnesota.

Ammunition in the Superior Court of California, in the County of Los Angeles, Case Number NA102575.

d. On April 9, 2018, a violation of California Penal Code Section 4573(A), Controlled Substance in a Correctional Facility, in the Superior Court of California, in the County of Los Angeles, Case Number NA108759.

e. On September 13, 2021, a violation of California Vehicle Code Section 10851(A), Theft of Vehicle, in the Superior Court of California, in the County of Los Angeles, Case Number NA117163.

### G. The Ammunition Traveled in Interstate Commerce

24. On May 5, 2022, ATF SA David Gonzalez, an ATF Firearms and Interstate Nexus Expert, reviewed the eight rounds of ammunition recovered from the firearm APODACA threw from the Charger and determined the following:

a. Three rounds were Winchester .40 S&W caliber ammunition, marked with the headstamp "WINCHESTER 40 S&W," and were manufactured by the Olin Corporation in Illinois or Mississippi;

b. Four rounds were Federal Cartridge (FC) .40 S&W caliber ammunition, marked with the headstamp "FC 40 S&W," and were manufactured by FC in Minnesota; and

c. One round was FC .40 S&W caliber ammunition, marked with the headstamp "FEDERAL 40 S&W," and was manufactured by FC in Minnesota.

25. SA Gonzalez determined that because all eight rounds of ammunition were found in California, they must have traveled in and affected interstate commerce.

## V. TRAINING AND EXPERIENCE REGARDING FIREARMS OFFENSES

26. From my training, personal experience, and the collective experiences related to me by other law enforcement Officers who conduct firearms investigations, I am aware of the following:

   a.   Persons who possess, purchase, or sell firearms generally maintain records of their firearm transactions as items of value and usually keep them in their residence, or in places that are readily accessible, and under their physical control, such in their digital devices. It has been my experience that prohibited individuals who own firearms illegally will keep the contact information of the individual who is supplying firearms to prohibited individuals or other individuals involved in criminal activities for future purchases or referrals. Such information is also kept on digital devices.

   b.   Many people also keep mementos of their firearms, including digital photographs or recordings of themselves possessing or using firearms on their digital devices. These photographs and recordings are often shared via social media, text messages, and over text messaging applications.

   c.   Those who illegally possess firearms often sell their firearms and purchase firearms. Correspondence between persons buying and selling firearms often occurs over phone calls, e-mail, text message, and social media message to and

xi

from smartphones, laptops, or other digital devices. This includes sending photos of the firearm between the seller and the buyer, as well as negotiation of price. Individuals who engage in street sales of firearms frequently use phone calls, e-mail, and text messages to communicate with each other regarding firearms that the sell or offer for sale. In addition, it is common for individuals engaging in the unlawful sale of firearms to have photographs of firearms they or other individuals working with them possess on their cellular phones and other digital devices as they frequently send these photos to each other to boast of their firearms possession and/or to facilitate sales or transfers of firearms.

      d.    Individuals engaged in the illegal purchase or sale of firearms and other contraband often use multiple digital devices.

## VI. TRAINING AND EXPERIENCE REGARDING DIGITAL DEVICES

27. As used herein, the term "digital device" includes the SUBJECT DEVICES.

28. Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that the following electronic evidence, inter alia, is often retrievable from digital devices:

      a.    Forensic methods may uncover electronic files or remnants of such files months or even years after the files have been downloaded, deleted, or viewed via the Internet. Normally, when a person deletes a file on a computer, the data contained in the file does not disappear; rather, the data remain on the

hard drive until overwritten by new data, which may only occur after a long period of time. Similarly, files viewed on the Internet are often automatically downloaded into a temporary directory or cache that are only overwritten as they are replaced with more recently downloaded or viewed content and may also be recoverable months or years later.

    b. Digital devices often contain electronic evidence related to a crime, the device's user, or the existence of evidence in other locations, such as, how the device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications, and materials on the device. That evidence is often stored in logs and other artifacts that are not kept in places where the user stores files, and in places where the user may be unaware of them. For example, recoverable data can include evidence of deleted or edited files; recently used tasks and processes; online nicknames and passwords in the form of configuration data stored by browser, e-mail, and chat programs; attachment of other devices; times the device was in use; and file creation dates and sequence.

    c. The absence of data on a digital device may be evidence of how the device was used, what it was used for, and who used it. For example, showing the absence of certain software on a device may be necessary to rebut a claim that the device was being controlled remotely by such software.

    d. Digital device users can also attempt to conceal data by using encryption, steganography, or by using misleading

filenames and extensions. Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed. Law enforcement continuously develops and acquires new methods of decryption, even for devices or data that cannot currently be decrypted.

29. Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that it is not always possible to search devices for data during a search of the premises for a number of reasons, including the following:

    a. Digital data are particularly vulnerable to inadvertent or intentional modification or destruction. Thus, often a controlled environment with specially trained personnel may be necessary to maintain the integrity of and to conduct a complete and accurate analysis of data on digital devices, which may take substantial time, particularly as to the categories of electronic evidence referenced above.

    b. Digital devices capable of storing multiple gigabytes are now commonplace. As an example of the amount of data this equates to, one gigabyte can store close to 19,000 average file size (300kb) Word documents, or 614 photos with an average size of 1.5MB.

30. The search warrant requests authorization to use the biometric unlock features of the SUBJECT DEVICES, based on the following, which I know from my training, experience, and review of publicly available materials:

a. Users may enable a biometric unlock function on some digital devices. To use this function, a user generally displays a physical feature, such as a fingerprint, face, or eye, and the device will automatically unlock if that physical feature matches one the user has stored on the device. To unlock a device enabled with a fingerprint unlock function, a user places one or more of the user's fingers on a device's fingerprint scanner for approximately one second. To unlock a device enabled with a facial, retina, or iris recognition function, the user holds the device in front of the user's face with the user's eyes open for approximately one second.

b. In some circumstances, a biometric unlock function will not unlock a device even if enabled, such as when a device has been restarted or inactive, has not been unlocked for a certain period of time (often 48 hours or less), or after a certain number of unsuccessful unlock attempts. Thus, the opportunity to use a biometric unlock function even on an enabled device may exist for only a short time. I do not know the passcodes of the devices likely to be found in the search.

c. The person who is in possession of a device or has the device among his or her belongings is likely a user of the device. Thus, the warrant I am applying for would permit law enforcement personnel to, with respect to any of the SUBJECT DEVICES that appears to have a biometric sensor and falls within the scope of the warrant: (1) depress APODACA's thumb and/or fingers on the devices; and (2) hold the device in front of

APODACA's face with his or her eyes open to activate the facial-, iris-, and/or retina-recognition feature.

31. Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

### VII. CONCLUSION

32. For all of the reasons described above, there is probable cause to believe that APODACA has committed a violation of 18 U.S.C. § 922(g)(1): Felon in Possession of Ammunition. There is also probable cause to believe that the items to be seized described in Attachment B will be found in a search of the SUBJECT DEVICES described in Attachment A.

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone on this 9th day of May, 2022.

_____
HONORABLE JACQUELINE CHOOLJIAN
UNITED STATES MAGISTRATE JUDGE